# EXHIBIT 1

United Nations



# General Assembly

A/HRC/43/51/Add.1

Distr.: General
26 December 2019
English
Original: Spanish

**Human Rights Council**
**Forty-third session**
24 February–20 March 2020
Agenda item 3
**Promotion and protection of all human rights, civil,
political, economic, social and cultural rights,
including the right to development**

## Visit to Colombia

### Report of the Special Rapporteur on the situation of human rights defenders*

*Summary*

    The Secretariat has the honour to transmit to the Human Rights Council the report of the Special Rapporteur on the situation of human rights defenders, Michel Forst, on his visit to Colombia, from 20 November to 3 December 2018.

    The Special Rapporteur notes the political will and initiatives of the Government to create a safe environment conducive to the defence of human rights in Colombia. However, he concludes that the vast majority of human rights defenders are at risk, and that this risk has increased in the three years since the signature of the Peace Agreement.

    The defenders most at risk are social leaders defending human rights in rural areas, in particular those promoting the implementation of the Peace Agreement and defending land and environmental rights and the rights of ethnic communities against the interests of criminal groups, illegal armed groups and State and non-State actors, such as national and international corporations and other powerful interest groups.

    Colombia remains the country with the highest number of murdered human rights defenders in Latin America, and threats against this group have soared. Despite progress in this area, there is still a high level of impunity. Although the President of the Government and other authorities have made public statements recognizing the important role of human rights defenders, there is a general lack of positive social recognition and they are undermined and criminalized by other State and non-State actors.

---

    * The summary of the report is being circulated in all official languages. The report itself, which is annexed to the summary, is being circulated in the language of submission (Spanish) and in English only.

GE.19-22542 (E)    210120    210120






> The Special Rapporteur stresses the importance of the effective implementation of the Peace Agreement and the development of a comprehensive policy for the defence of human rights, with the full participation of human rights defenders and civil society, and of further progress in the fight against impunity to ensure a safe and enabling environment for human rights defenders.

Annex

# Report of the Special Rapporteur on the situation of human rights defenders on his visit to Colombia

## I. Introduction

1. The Special Rapporteur on the situation of human rights defenders conducted an official visit to Colombia from 20 November to 3 December 2018 at the invitation of the Government. The main objective of his visit was to assess the situation of human rights defenders in Colombia and to evaluate whether the Colombian State guarantees a safe and supportive environment for the defence of human rights throughout the country. That assessment was conducted in the light of the State's obligations and commitments under international human rights law and under the Declaration on the Right and Responsibility of Individuals, Groups and Organs of Society to Promote and Protect Universally Recognized Human Rights and Fundamental Freedoms (Declaration on Human Rights Defenders). Another aim of the visit was to observe and guide the efforts of the new administration to improve the protection of human rights defenders.

2. The Special Rapporteur visited the capital, Bogotá, and various locations in the departments of Norte de Santander, Antioquia, Magdalena, La Guajira and Cauca and met with rights defenders from Nariño. During his visit, he met with the President of the Republic, senior officials from the Ministry of Foreign Affairs, the Ministry of the Interior, the Ministry of Justice, the Ministry of Defence and the Office of the Presidential Advisor on Human Rights and International Affairs, the Attorney General and Counsel General and judges of the Supreme Court. He also met with the transitional justice mechanisms and officials from the Land Restitution Unit and the National Land Agency. The Special Rapporteur also held talks with the Ombudsman and the director and staff of the National Protection Unit.

3. The Special Rapporteur met with a large number of defenders – about 60 per cent of them women – representing various sectors of civil society who are working in a number of fields.

4. During his visit, the Special Rapporteur participated in a high-level public event to mark International Human Rights Defenders Day, organized by the Office of the United Nations High Commissioner for Human Rights (OHCHR), the United Nations Entity for Gender Equality and the Empowerment of Women and the Ombudsman's Office.

5. The Special Rapporteur wishes to express his gratitude to the Government for its invitation and for its cooperation before and during his visit. He extends his thanks to the State and departmental authorities that met with him and to the OHCHR office in Colombia for its invaluable support in connection with his visit. The Special Rapporteur is also grateful to the more than 200 human rights defenders who met with him and shared their experiences and insights, particularly to those who travelled long distances to do so.

## II. The legal and institutional framework for the protection of human rights defenders

6. The Constitution of 1991 states that Colombia is a democratic, participatory, pluralist, unitary and decentralized republic and guarantees the fundamental rights and freedoms necessary for the effective participation of citizens in public and political life and the involvement of civil society in the promotion and defence of human rights.[1] In addition, it recognizes the principle of equality and the promotion of the rights of indigenous and

---

[1] See articles 13, 16, 18, 20, 23, 37 to 40 and 43 of the Constitution.

Afro-Colombian peoples,[2] and enshrines the rights and autonomy of indigenous peoples[3] and the Afro-Colombian population.[4]

7. Colombia has ratified nine key international human rights treaties,[5] the core regional human rights treaties[6] and the International Labour Organization (ILO) Indigenous and Tribal Peoples Convention, 1989 (No. 169)[7] and supported the United Nations Declaration on the Rights of Indigenous Peoples. Once ratified by Congress, human rights treaties have constitutional status and prevail over domestic law.[8]

8. On 24 November 2016, the Government of Colombia and the Revolutionary Armed Forces of Colombia – People's Army (FARC-EP) concluded the Final Agreement for Ending the Conflict and Building a Stable and Lasting Peace, which put an end to more than five decades of armed conflict between the two parties.[9] The Peace Agreement, which was subsequently endorsed by the Congress, constitutes a special agreement in accordance with common article 3 of the Geneva Conventions relating to the Protection of Victims of International Armed Conflicts for the purposes of its international validity.[10]

9. In recent years, the State, in partnership with civil society, has made significant efforts to improve its legal and institutional framework with a view to facilitating a safe and enabling environment for the defence and promotion of human rights.[11]

10. In 2009, State institutions and human rights organizations, with the support of the international community, launched the national mechanism to safeguard the work of human rights defenders and social and community leaders, with a mandate to adopt legislative, institutional and other measures focused on prevention, protection and investigation in the field of human rights, and established a permanent forum for dialogue between civil society and the Government through the National Committee on Safeguards for Human Rights Defenders and the 14 regional committees.

11. The National Protection Unit was established in 2011 under the Ministry of the Interior.[12] Two months later, the Ministry of the Interior and the National Protection Unit[13] launched a prevention and protection programme focusing on the rights to life, freedom, physical integrity and security of persons, groups and communities, which establishes the duty of the State to protect human rights defenders and others through individual and collective prevention and protection measures based on a differentiated and gender-sensitive approach. The National Protection Unit has become one of the most sophisticated systems for the protection of human rights defenders in the region (see paragraphs 56 to 59 below on the Unit).

12. The recognition and protection of women defenders has been strengthened following the adoption by the National Protection Unit of a gender-sensitive approach in 2012[14] and

---

[2] *Ibid.*, arts. 7, 8, 10, 13, 17 and 70.
[3] *Ibid.*, arts. 1, 7, 10, 63, 70, 96, 171, 176, 246, 286, 287 and 328 to 330.
[4] *Ibid.*, art. 33 and transitory art. 55.
[5] https://tbinternet.ohchr.org/_layouts/15/TreatyBodyExternal/Treaty.aspx?CountryID=37&Lang=SP.
[6] www.oas.org/es/cidh/mandato/documentos-basicos/ratificacion-adhesion-denuncia-intrumentos-interamericanos-derechos-humanos.pdf.
[7] www.ilo.org/dyn/normlex/es/f?p=1000:11200:0::NO:11200:P11200_COUNTRY_ID:102595.
[8] Constitution, arts. 53, 93, 94, 102 and 214 (2).
[9] www.altocomisionadoparalapaz.gov.co/procesos-y-conversaciones/Paginas/Texto-completo-del-Acuerdo-Final-para-la-Terminacion-del-conflicto.aspx.
[10] In August 2019, a small group of former FARC-EP combatants, led by Iván Márquez, announced a return to armed struggle. The Fuerza Alternativa Revolucionaria del Común (People's Alternative Revolutionary Force) (FARC) party confirmed that 95 per cent of former combatants support the Peace Agreement (S/2019/780, para. 3).
[11] Office of the Presidential Advisor on Human Rights and International Affairs, *Informe de Homicidios contra Líderes Sociales y Defensores de Derechos Humanos 2010–2019* (Report on murders of social leaders and human rights defenders), pp. 2–4.
[12] Decree No. 4065 of 2011.
[13] Decree No. 4912 of 2011, amended by Decree No. 1225 of 2012.
[14] In 2012, the National Protection Unit adopted a specific gender-sensitive protocol focused on the rights of women, established the Committee on Risk Assessment and the Recommendation of

the establishment of the intersectoral committee on guarantees for women leaders and human rights defenders in 2016,[15] which is tasked with coordinating and guiding the formulation, implementation and monitoring of the Comprehensive Programme of Guarantees for Women Leaders and Human Rights Defenders and its action plan of 2018, under the leadership of the Ministry of the Interior and women's organizations and with the support of the United Nations.[16]

13. In addition, important specialized mechanisms for the protection of human rights defenders have been established under the Peace Agreement:[17]

(a) The National Committee for Security Guarantees (2017), headed by the President of the Republic and with the participation of civil society, responsible for adopting a policy to dismantle criminal organizations, including successors of paramilitarism and their support networks, and combat conduct that attacks human rights defenders and social or political movements.[18] Although the Commission is supposed to meet once a month under the terms of the Decree, it has met only twice in plenary since the change of Government.

(b) The new prevention and early warning system for rapid response to criminal acts and conduct that put human rights defenders, including community leaders, at risk[19] (see paragraphs 60 to 62 below, on the Ombudsman's Office).

(c) The Comprehensive Security and Protection Programme for Communities and Organizations in the Territories.[20] A decree setting out the role of governors and mayors in the protection of human rights defenders has been published.[21]

14. Since 2016, the Attorney General's Office has implemented a strategy to prioritize the investigation and prosecution of murders of human rights defenders. The first investigative assumption is the link between the crime and the victim's work defending human rights. A special unit for the investigation of murders, massacres, attacks and threats against human rights defenders[22] has been set up, together with mobile units. The special unit applies specific intervention protocols and has strengthened the investigation of threats. Since 2017, the Counsel General's Office has had the authority to receive complaints against public servants for acts targeting human rights defenders[23] and has been cooperating with OHCHR, in coordination with the Ombudsman's Office, to strengthen this function in the territories.[24] It has established the Committee for the Protection of Life to coordinate this work,[25] which is gradually being implemented in the territories.[26]

15. On 23 August 2018, the President of the Republic, the Public Prosecution Service and social organizations, with the support of the international community, concluded the Apartadó Covenant for the Life and Protection of Social Leaders and Human Rights Defenders.[27] The Covenant sets out 11 commitments to address the stigmatization, persecution and killing of human rights defenders and social leaders. In order to implement

---

Measures for Women and designated four representatives of women's organizations for risk assessment and the adoption of measures for women human rights defenders.

[15] Decree No. 1314 of 2016.
[16] Ministry of the Interior, resolution No. 0845 of 14 June 2018.
[17] Point 3.4 of the Peace Agreement.
[18] Decree-Law No. 154 of 2017.
[19] Decree No. 2124 of 2017.
[20] Decree No. 660 of 2018.
[21] Decree No. 2252 of 2017.
[22] Decree No. 898 of 2017.
[23] Directive No. 002 of the Counsel-General's Office of 2017.
[24] www.procuraduria.gov.co/portal/media/file/memorando%20de%20entendimiento(1).pdf.
[25] Counsel General's Office, resolution No. 393 of 9 July 2018.
[26] www.procuraduria.gov.co/portal/Procuradorpidio_seguimiento_a_medidas_de_prote-ccion_a_lideres_para_lideres_de_Juntas_de_Accion_Comunal.news.
[27] www.procuraduria.gov.co/portal/media/file/PACTO%20POR%20LA%20VIDA.pdf.

the Covenant, the Government developed the timely action plan,[28] which it prepared without the involvement of civil society or international organizations.[29]

16. On 3 May 2019, the Government approved the formulation of a comprehensive public policy to ensure respect for and safeguards for the work of human rights defenders. This process was launched with the participation of various groups of human rights defenders across the country and the private sector, with the support and follow-up of OHCHR, the United Nations Development Programme, the Mission to Support the Peace Process in Colombia and the International Organization for Migration.

17. On 7 November 2019, national human rights platforms and defenders suspended their participation and dialogue with the Government on the formulation of the policy.[30] The Government has publicly reiterated its commitment to a participatory process for the elaboration of this policy, which it hopes to present during the first quarter of 2020.[31] The Special Rapporteur welcomes this important initiative, as highlighted in his first key recommendation following the visit, and recommends that the necessary time be allocated for the elaboration of the policy, with the participation and agreement of all the social sectors concerned.

18. The renewal of the mandate of the OHCHR office in Colombia in October 2019 for a further three years is a step forward for human rights and the protection of human rights defenders.[32] Based on this mandate, OHCHR will continue to provide technical cooperation and monitor and report on the human rights situation and the responsibilities established in the Peace Agreement.

## III. Situation of human rights defenders

19. The purpose of the Special Rapporteur's visit was to determine whether human rights defenders in Colombia are safe and empowered to promote and defend human rights and whether the Government ensures that human rights can be defended and promoted in a safe and enabling environment.

### A. Consistently high numbers of murders and other violations

20. From 2016 to 30 June 2019, Colombia was the country with the highest number of murders of human rights defenders in Latin America, according to the cases compiled and verified by the United Nations,[33] and with a large number of threats, attacks, displacements and other violations of the rights of defenders.[34] Human Rights defenders are killed and abused for keeping the peace, acting against the interests of organized crime, illegal economic activities, corruption and illegal land holdings and for protecting their communities. Women human rights defenders are also subjected to specific gender-based violations and their families are targeted.

21. While the overall homicide rate in Colombia has continued to decline since 2011 and since the signature of the Peace Agreement (with the exception of a slight increase in

---

[28] www.mininterior.gov.co/sites/default/files/plan_de_accion_oportuna_de _prevencion_y_proteccion_0.pdf.
[29] Decree No. 2137 of 2018.
[30] www.coljuristas.org/nuestro_quehacer/item.php?id=264.
[31] www.elpais.com.co/colombia/gobierno-presentara-conpes-para-proteccion-de-lideres-sociales-en-2020.html.
[32] The OHCHR office in Colombia was set up in 1996. The original mandate and subsequent renewals are available at: www.hchr.org.co/index.php/mandato-de-la-oficina.
[33] Cases compiled by OHCHR and other United Nations entities on the basis of verified reports of killings of human rights defenders, journalists and trade unionists, in line with international efforts to strengthen compliance by States Members with their responsibility to guarantee public access to information and protect fundamental freedoms.
[34] *Front Line Defenders Global Analysis 2018*, pp. 4, 7 and 16–18.

2018), it remains high.[35] This decrease is in contrast to the increase in the killings of human rights defenders, including social leaders, since 2016, as reported by State sources (Ombudsman's Office), the United Nations (OHCHR) and civil society (for example, the Somos Defensores programme) (see table). The Special Rapporteur explains that the differences in the figures reported are due to the different methodologies used to document cases. He regrets that the discussion of these differences has diverted attention and efforts from the key issues that need to be addressed in order to ensure a safe and supportive environment for the defence of human rights in Colombia.

**Human rights defenders killed in Colombia**

| Year | Ombudsman's Office | | OHCHR[a] | | Somos Defensores | |
|---|---|---|---|---|---|---|
| | Total | Women | Total | Women | Total | Women |
| 2019 (as at 30 June)[b] | 49 | 10 | 52 | 8 | 59 | 10 |
| 2018 | 178 | 14 | 115 | 10 | 155 | 9 |
| 2017 | 126 | 18 | 96 | 14 | 106 | 16 |
| 2016 | 133 | 16 | 61 | 4 | 80 | 9 |
| 2016–2019 (as at 30 June) | 486 | 58 | 324 | 36 | 400 | 44 |

  *a* OHCHR recognizes that the number of murders of human rights defenders it has documented does not represent the total number of cases.

  *b* The figures from the Ombudsman's Office cover the period up to 17 May 2019.

22.  The Office of the Presidential Advisor's report of April 2019 and the recent update thereto [36] highlight a significant decrease in the number of murders of human rights defenders and the number of municipalities affected since President Iván Duque came to power, based on its interpretation of the cases documented by OHCHR.[37] Nonetheless, the Special Rapporteur notes that the murder rate remains very high, with 52 murders of human rights defenders verified by OHCHR in 47 municipalities in the first half of 2019.[38]

23.  The Ombudsman and the Somos Defensores programme documented an increase in the number of threats and cases of intimidation against human rights defenders from 2016 to May 2019.[39] The Ombudsman's Office confirmed that, between March 2018 and May 2019, more than twice as many threats were made compared to 2018 (a 113 per cent increase), primarily against indigenous community leaders and representatives of victims. Threats are made either directly by the aggressors by means of leaflets, telephone calls and WhatsApp messages or through third parties.

24.  Human rights defenders, including community leaders and officials from the community action councils and indigenous, Afro-Colombian and campesino leaders, continue to bear the brunt for defending human rights, ethnic rights and land rights and/or for supporting the implementation of peace agreements, particularly crop substitution programmes. The most affected areas in 2018 and 2019 included Cauca, Antioquia, Norte de Santander, Valle del Cauca, Putumayo, Caquetá and Nariño.[40]

---

[35] In 2018, the overall homicide rate in Colombia per 100,000 people was 26.2. See also United Nations Office on Drugs and Crime, *Global Study on Homicide 2019*.

[36] Office of the Presidential Advisor on Human Rights and International Affairs, *Informe de Homicidios contra Líderes Sociales y Defensores de Derechos Humanos 2010-2019* (Report on murders of social leaders and human rights defenders 2010–2019). The updated information is available at: www.derechoshumanos.gov.co/Prensa/2019/Paginas/Actualizaci%C3%B3n-Informe-de-Homicidios-L%C3%ADderes.aspx.

[37] OHCHR recognizes that the number of murders of human rights defenders it has documented does not represent the total number of cases.

[38] Two cases are in the process of being verified.

[39] https://somosdefensores.org/wp-content/uploads/2019/10/informe-Somos-defensores-ENERO-JUNIO-2019-oct-8-web-final.pdf.pdf.

[40] Marcha Patriótica, the People's Agrarian, Campesino and Ethnic Summit, and the Institute for Peace and Development Studies, *Todos los nombres, todos los rostros: Informe de derechos humanos sobre*

### B.  High levels of impunity that perpetuate the cycle of violence against human rights defenders

25.    Historically, the impunity rate for murders of human rights defenders in Colombia has stood at around 95 per cent,[41] compared to an overall impunity rate for homicide cases reported to the authorities of between 86.58 per cent and 94.30 per cent.[42] Since 2016, the Attorney General's Office has decided to prioritize the investigation of the 302 murders of human rights defenders documented by OHCHR.[43] This figure does not represent the total number of murders committed and does not include those that took place prior to the Peace Agreement. According to information from the Attorney General's Office as at August 2019, the status of the 302 murder cases documented by OHCHR since 2016 was as follows: final judgments had been handed down in 33 cases, 55 were in the trial phase, 45 were under investigation, with charges having been brought, 41 were in the preliminary investigation phase with arrest warrants issued, and 3 had been dismissed because the suspect had died.[44] According to these figures, 11 per cent of cases have been clarified,[45] while there has been no establishment of guilt in the remaining 89 per cent of cases, although progress is being made in the investigation of 54 per cent of those cases.

26.    When murders and other human rights violations committed against defenders go unpunished, this sends a message that the important work they do in society is not recognized, and is an invitation to continue violating their rights (A/74/159). The Special Rapporteur urges the Attorney General's Office to continue investigating the murders of human rights defenders committed between 2010 and 2015, as agreed with civil society in the framework of the National Committee on Safeguards, and death threats against human rights defenders, in accordance with the five prioritized investigative assumptions identified in 2018, all with a view to preventing such crimes. In addition, he expects progress and results in relation to other violations of defenders' rights, such as enforced disappearances and, in particular, sexual violence against women defenders and their daughters, which continues to take place.[46]

### C.  Stigmatization and criminalization of human rights defenders

27.    The Special Rapporteur has received information on statements made by the President and other senior officials recognizing the importance of human rights defenders, including social leaders,[47] and of the strategic objective under the timely action plan to eliminate stigmatization of this group. At the same time, however, political leaders, public officials, persons of influence, including from the private sector, and members of illegal armed groups stigmatize them as "guerrilleros", "terroristas", "anti-development" and "informants". The governor of Antioquia publicly declared that there were criminal gangs with close ties to the illegal armed group Clan del Golfo and persons linked to the National Liberation Army (ELN) behind the miners' strikes in Segovia and Remedios in 2018.[48] In 2017, the former Minister of Defence said that the killings of human rights defenders were the result of problems related to boundary disputes, "girl trouble" and unlawful assets. In

---

*la situación de líderes/as y defensores de derechos humanos en los territorios* (2018) and information from the Colombian Commission of Jurists (2019).

[41] Somos Defensores, 2018 annual report: *La Naranja Mecánica*, p. 63.
[42] A/HRC/40/3/Add.3, para. 56.
[43] Attorney General's Office, bulletin 29986, 20 August 2019. Somos Defensores, 2018 annual report, pp. 63 to 67.
[44] Information as at 20 August 2019. In the 125 remaining murder cases, preliminary investigations are ongoing, led by the criminal investigation service.
[45] The Special Rapporteur does not know whether the persons behind the killings were identified in the 33 cases in which final judgments were handed down.
[46] The Somos Defensores programme identified at least 538 murders of human rights defenders between 2009 and 2015.
[47] www.mininterior.gov.co/sites/default/files/plan_de_accion_oportuna_de_prevencion_y_proteccion_0.pdf. https://id.presidencia.gov.co/Paginas/prensa/2019/190612-Palabras-del-Presidente-Ivan-Duque-durante-la-sesion-de-la-Mesa-por-la-Proteccion-a-la-Vida.aspx.
[48] https://caracol.com.co/emisora/2017/08/20/medellin/1503244426_902765.html.

2018, the current Minister of Defence declared that mafias and organized criminal groups were behind public protests.[49] Such statements undermine human rights defenders and expose them to greater risks and violations.

28. The criminalization of human rights defenders further undermines their legitimacy. There have been at least 70 reported cases in which human rights defenders from the People's Agrarian, Campesino and Ethnic Summit (33 of whom are members of the Congress of the Peoples) have been accused, prosecuted and detained on charges, among others, of belonging to illegal armed groups, such as the disbanded FARC and ELN groups, or of colluding with these groups in connection with their social leadership to promote peace and a negotiated solution to the conflict.[50]

29. In the context of efforts to defend land and environmental rights, at least 202 defenders have been prosecuted since 2012.[51] By way of example, during the Special Rapporteur's visit, eight leaders from San Luis de Palenque were arrested and accused of collusion to commit an offence, violence against a public servant and obstructing a public road, and two of them with attempted homicide in connection with their participation in and leadership of the social protests between 2016 and 2018 in response to the failure of Canadian public company Frontera Energy to fulfil its obligation to compensate communities affected by environmental damage and to repair damaged roads. These human rights defenders remain deprived of their liberty, three of them in prison and five on house arrest.

30. The Special Rapporteur is concerned at the apparent connection between Frontera Energy, the army's 16th brigade and the Attorney General's Support Office in this criminalization and the possible impact of the agreement between Ecopetrol S.A. and the Attorney General's Office on the situation. In November 2018, Frontera Energy signed two agreements with the Ministry of Defence for a total of US$ 1,343,106 to secure army protection for its activities.[52] On 4 December 2018, the army and the police accused the aforementioned leaders of being members of "Los Jinetes con Careta", an illegal armed group whose existence has yet to be recognized by the competent authorities.[53] Furthermore, since 2015, Ecopetrol, the main Colombian hydrocarbon exploitation company, has signed five cooperation agreements with the Attorney General's Office for a total of US$ 24,698,485 to strengthen the investigative and prosecutorial capacity of the Attorney General's Support Office to deal – inter alia – with crimes of obstruction of public roads during social protests that affect the functioning of Ecopetrol and/or its associated companies, such as Frontera Energy.[54]

31. Criminalization in the context of social protests also involves arbitrary arrests and the excessive use of force by the public security forces, as occurred during the education sector protests just days before the Special Rapporteur's visit, and the indigenous "minga" (protest) of March and April 2019 in the south-western region of the country, in which there were at least 104 arrests and 12 people were prosecuted, according to the information received. In this context, the Special Rapporteur is concerned about bill No. 281 of 2018, which could contribute to the criminalization of social protests, and the apparent failure to implement the National Protocol on Social Protest adopted within the framework of the National Committee on Safeguards.[55]

---

[49] https://verdadabierta.com/mindefensa-lideres-sociales-lios-faldas-subvenciones-narcos/.
[50] Information provided by the Committee of Solidarity with Political Prisoners and organizations of the People's Agrarian, Campesino and Ethnic Summit.
[51] www.elespectador.com/colombia2020/pais/en-colombia-202-defensores-del-ambiente-han-sido-judicializados-informe-ante-la-cidh-articulo-883268.
[52] Agreement 18-014, available at: http://rutasdelconflicto.com/convenios-fuerza-justicia/node/72 and agreement 18-017, available at: http://rutasdelconflicto.com/convenios-fuerza-justicia/node/50.
[53] "*El ejército y la policía presentaron a los ocho líderes sociales capturados en San Luis de Palenque*", video published on 4 December 2018, available at: www.youtube.com/watch?v=6xsC_d5ISqY.
[54] "*Petroleras y mineras financian a la fuerza pública y a la Fiscalía*", available at: http://rutasdelconflicto.com/convenios-fuerza-justicia/node/437.
[55] Ministry of the Interior, resolution No. 1190 of 3 August 2018.

### D. Specific groups of human rights defenders who are at risk

#### 1. Human rights defenders in rural areas: social, community and ethnic leaders, especially those promoting the peace agreements

32. The human rights defenders most at risk in the post-Agreement era are social and community leaders, including those with positions in the community action councils, ethnic leaders and, above all, the promoters of policies deriving from the Peace Agreement, especially the Comprehensive National Programme for the Substitution of Illicit Crops and agrarian reform, and land restitution claimants. According to a study by the Colombian Commission of Jurists, in the period between the signature of the Peace Agreement and the end of July 2018, 23 per cent of all murdered human rights defenders were members of the community action councils (including four leaders of African descent), 20 per cent were community leaders, 20 per cent were ethnic leaders (12 per cent indigenous and 9 per cent of African descent), 5 per cent were defenders of victims' rights, 11 per cent were campesino leaders, 2 per cent were land restitution claimants and 2 per cent were human rights lawyers.[56]

33. The vast majority of these human rights defenders in rural areas not only serve on their community councils, as president or in other positions, but also belong to various local and national organizations and movements. Since the signing of the Peace Agreement, Marcha Patriótica and the National Coordinator of Coca, Poppy and Marijuana Growers have reported the highest number of murdered members. The members of ethnic social movements, in particular Communities Building Peace in the Territories and the Regional Indigenous Council of Cauca, received the highest number of threats.[57]

34. The context in which human rights defenders carry out their work is extremely complex. Their human rights agenda puts them at risk, particularly in territories where the State is completely absent and communities are not effectively protected by the public law enforcement bodies with a presence there. The Special Rapporteur heard testimonies of how they are forced to interact with the various illegal and criminal armed groups and how they are targeted if they take a stand against their presence, forced recruitment, extortion or the sexual exploitation of their daughters or promote the Peace Agreement and, in particular, rural reform or the illicit crop substitution programme.[58]

35. These human rights defenders in rural areas demand from the State the right to enjoy economic, social and cultural rights without discrimination. Their demands include access to safe drinking water, primary education and basic health care, all of which are essential minimum requirements that the State has an immediate obligation to fulfil. They also demand access to electricity and roads, which is fundamental for them to be able to sell the alternatives to coca that are produced, and denounce the inaction and lack of protection afforded by the public security forces. When they advocate for the resumption of peace talks with the ELN they are undermined and even criminalized by the authorities and/or non-State actors.

#### 2. Defenders of ethnic, land and environmental rights

36. Indigenous and Afro-Colombian defenders reported to the Special Rapporteur the particular risks they face. In addition to the challenges and violations described above, they face de facto racial discrimination with structural and historical causes and risks intrinsically related to the defence of the human rights of their peoples, their way of life and their lands. Ethnic and campesino leaders' defence of land and environmental rights means that they oppose the interests and pressures of national and international companies that exploit the natural resources in their territories (such as monocultures and mega-projects) and the interests of illegal and mechanized mining and various armed actors. In this context, they are killed and attacked, and entire communities are harassed, intimidated and even displaced. The National Indigenous Organization of Colombia has reported the

---

[56] Colombian Commission of Jurists, *¿Cuáles son los patrones? Asesinatos de líderes sociales en el post Acuerdo*, October 2018, pp. 22–24.
[57] *Ibid.*, p. 26.
[58] End of mission statement by the Special Rapporteur on the situation of human rights defenders, Michel Forst, visit to Colombia, 20 November–3 December 2018, p. 20.

assassination of 167 indigenous leaders since the signing of the Peace Agreement.[59] At least 21 land and environmental defenders and 6 Afro-Colombian defenders were killed in 2018.[60]

37. For ethnic defenders, the lack of free and informed prior consultation, or inadequate consultation, in relation to the prospecting or exploitation of existing resources on their land, the transfer of their land or the relocation of their communities off their land is a major risk factor. The lack of prior consultation or inadequate prior consultation is also an additional source of violations of the rights of these communities that effectively deprives them of their ancestral lands and natural resources and of their right to participate in decisions on matters that concern them.[61]

38. By way of example, in 2006 the right of the indigenous Bari people to prior consultation was respected only after they took legal action to defend their territories from the presence and activities of the Colombian State-owned company Ecopetrol.[62] Other legal actions undertaken by indigenous defenders in 2011 demanding the recognition and legal protection of what they consider the entirety of their ancestral territories (expansion of their indigenous reserves) remain pending, despite the favourable ruling of the Constitutional Court (T-052) in 2017. The pending application will now have to address new claims that have arisen over the years, including the demand to establish a campesino reserve area[63] and the expansion of African palm monoculture recently announced by the Government without prior consultation[64] (despite the fact that this is compulsory pursuant to an order by the Court) on part of the territories claimed by the indigenous defenders.[65]

39. The Bari indigenous people and their leaders also face risks associated with defending their territory against the control of illegal armed groups, which have recently been reconfigured since the signing of the agreements, such as the ELN, the People's Liberation Army and the FARC-EP dissidents. In 2018, a leader and another member of the indigenous community were shot by presumed ELN members. According to the information received, the protection measures offered by the National Protection Unit to the affected leaders and communities are inadequate.

40. The Special Rapporteur is concerned about the various legislative initiatives on the right to prior consultation of ethnic groups, which could represent a step backwards. The Colombian State has an obligation to respect international law and the jurisprudence of the Constitutional Court in relation to the right to free, prior and informed consultation of these peoples.[66]

41. The Special Rapporteur also heard testimony from environmental activists, including campesino associations and movements, on the challenges they face in defending the environment against corporate and State interests. The Ríos Vivos Antioquia Movement, composed of 15 grass roots social organizations, reports having suffered serious attacks in carrying out its work in defence of the environment and the human rights of the communities affected by the construction of the Ituango hydroelectric dam by Empresas Públicas de Medellín.

42. The Ríos Vivos Antioquia Movement reported 151 incidents between 2013 and February 2018.[67] The killing of human rights defender Nelson Giraldo Posada and the threats received by other members of the Movement have been the subject of two

---

[59] www.telesurtv.net/news/indigenas-colombia-asesinados-acuerdo-paz-20190904-0009.html.
[60] Somos Defensores, 2018 annual report, p. 92.
[61] OHCHR, *El Derecho de los Pueblos Indígenas a la Consulta Previa, Libre e Informada*, 2014, pp. 16–19, and OHCHR, *El Derecho de las Comunidades Afrocolombianas a la Consulta Previa, Libre e Informada*, 2014, pp. 22–24.
[62] Decision T-880/06 of the Colombian Constitutional Court, 26 October 2006.
[63] www.corteconstitucional.gov.co/relatoria/2017/t-052-17.htm.
[64] www.laopinion.com.co/economia/aprueban-credito-de-8400-millones-para-sembrar-palma-de-aceite-en-la-gabarra-184603#OP.
[65] See Act No. 21 of 1991 and the following rulings of the Constitutional Court: T/201-17 of 3 April 2017; SU-039 of 21 February 1997; T-002 of 2017, and SU-123 of 15 November 2018.
[66] *Ibid.*
[67] Information leaflet *Movimiento Ríos Vivos Antioquia*, 2018, pp. 4–12.

communications to the special procedures.[68] In May 2018, the Movement reported the murder of two people who claimed to be members of the Movement. Members of the Movement continue to be stigmatized and threatened and are at risk from a range of actors. Recently, Milena Florez, the Movement's second spokesperson, had to leave the country because of death threats from illegal armed groups in connection with her work as an environmental activist, her support for crop substitution and her reporting of drug trafficking and increased drug sales in Bajo Cauca and Norte de Antioquia.

43. During his meeting with representatives of Empresas Públicas de Medellín, the Special Rapporteur received information about the project, the complaint and claim mechanisms, and about the Movimiento Ríos Vivos Antioquia, including the company's request to the Attorney General's Office and other State bodies to investigate and take appropriate action in relation to the two recent murders mentioned above.[69]

### 3. Women human rights defenders

44. In the period between the signing of the Peace Agreement and June 2019, the number of women human rights defenders killed was generally on the rise, with a small decrease in 2018. In the first half of 2019, women human rights defenders made up between 17 per cent and 20 per cent of the total number of defenders killed, marking an increase over previous years. According to the information available, the women defenders killed are mostly community leaders, defenders of economic, social, cultural and environmental rights, and defenders of the rights of women and ethnic peoples.

45. The prevailing patriarchal culture in Colombian society and family and the gap in the enjoyment of rights between men and women, especially in rural areas, exacerbate and shape the risks faced by women defenders. These risks are aggravated for women defenders who belong to ethnic or socially marginalized groups. In order to take on public roles and/or defend women's rights, many women defenders have to overcome multiple barriers within their families and communities: from having their legitimacy undermined and attacks on their identity, to being labelled "bad mothers" and "women of dubious reputation", to threats and gender-based violence at the hands of their partners and colleagues. Afro-Colombian leader Hilda Hurtado, a defender of the rights of ethnic women since 2014, managed to establish and formalize the women's organization África Viva en las Mujeres de los Consejos Comunitarios del Pacífico Sur Nariñense (AFRIMUCPAS) in 2018, after years of obstacles and struggle, thanks to her determination and persistence and work with her fellow female defenders.

46. Women human rights defenders who have managed to take up positions and are carrying out their work often continue to face the risks and violations described above, combined with risks posed by external actors. Like their male counterparts, women defenders receive death threats and are attacked and even killed, but these threats often have a strong sexist and sexual content and also target their children. The killings of women defenders can be extremely violent and brutal, and in some cases are preceded by sexual violence and acts of cruelty and torture.[70] According to the Ombudsman's Office, this was the case in 17 per cent of the murders committed between January 2016 and October 2017.

47. The president of the community action council of Catatumbo, also a member of the Catatumbo Campesina Association and the National Coordinator of Coca, Poppy and Marijuana Growers, became a military target of an illegal armed group for having promoted the Comprehensive National Programme for the Substitution of Illicit Crops in her village. She and her family had to leave the community after her son also received death threats in connection with her role as a defender and another of those threatened was killed. In the Norte de Santander area alone, 175 community leaders who signed the Peace Agreement are being threatened and put under pressure not to continue promoting the Comprehensive National Programme for the Substitution of Illicit Crops.

---

[68] COL 7/2014 and COL 11/2013.

[69] https://reliefweb.int/report/colombia/colombia-asesinato-de-dos-integrantes-del-movimiento-r-os-vivos-antioquia-y-dos-de.

[70] Information provided by Sisma Mujer on four cases in 2017.

48. The Special Rapporteur commends the important role of women defenders in the promotion of democracy, justice and peace in Colombia. Thanks to the women's and feminist movement and its leadership before and during the Peace Agreement negotiations, the Agreement contains 122 cross-cutting gender-sensitive measures.

### 4. Defenders of the rights of lesbian, gay, bisexual, transgender and intersex persons

49. The Special Rapporteur deeply regrets the death in 2017 of six defenders of the rights of lesbian, gay, bisexual, transgender and intersex persons (one fewer than in 2016) and the increase in threats against this group, as well as the fact that the Attorney General's Office opened only 17 investigations into the 60 threats reported in 2017.[71] Information for 2018 indicates that one defender of the rights of lesbian, gay, bisexual, transgender and intersex persons was killed. Defenders of the rights of that community have identified an urgent need to improve the protection provided by the National Protection Unit, which does not currently meet the specific needs of this category of defenders.

50. The Special Rapporteur recognizes the important role of defenders of the human rights of lesbian, gay, bisexual, transgender and intersex persons and that of the Constitutional Court in advancing the rights of that community. As a result of their work, same-sex marriage and social security and pension rights for same-sex couples are now recognized in Colombia, as are the rights to undergo gender reassignment surgery and to change one's name and gender in the Civil Registry. The Special Rapporteur welcomes the adoption of public policy to guarantee the rights of lesbian, gay, bisexual, transgender and intersex persons and persons of diverse sexual orientations and gender identities.[72]

51. However, important initiatives supported or led by civil society have been attacked by conservative sectors of society that are opposed to such advances and the recognition of such rights, which they consider "an imposition of the so-called 'gender ideology'", contrary to traditional Christian values and the traditional concept of family. The process of reviewing school materials to raise awareness of gender roles and diversity of gender identities, in compliance with Constitutional Court decision T-478,[73] was halted following the collection of two million signatures and provoked attacks in the media and on social networks against the former Minister of Education and the lesbian, gay, bisexual, transgender and intersex community.[74] Similarly, there were objections to the inclusion of contributions to the Peace Agreement related to the rights of this community, leading some to vote no or abstain from voting in the referendum on the Peace Agreement, which, according to some sources, may have influenced the results.[75]

### 5. Human rights lawyers and lawyers for victims of the conflict

52. Both lawyers representing victims of serious human rights violations during the conflict and human rights lawyers are at risk. They make up at least 2 per cent of all defenders killed since the signing of the Peace Agreement.[76] They receive death threats and are falsely accused of belonging to subversive groups, and their houses and associations are subject to searches. The work of these defenders and associations such as the Regional Corporation for the Defence of Human Rights, the Luis Carlos Pérez Lawyers' Collective and the National Movement of Victims of State Crimes is fundamental in supporting victims in the context of transitional justice, advising them and representing them when

---

[71] Colombia Diversa, Caribe Afirmativo, *La discriminación, una guerra que no termina.* Report on the human rights of lesbian, gay, bisexual and transgender people in Colombia 2017, 2018, pp. 29, 56 and 73.
[72] Decree No. 762 of 2018.
[73] This judgment, dated 3 August 2015, was handed down in the case of a 16-year-old student who committed suicide because of the bullying he faced at school on account of his sexual orientation.
[74] www.eltiempo.com/vida/educacion/cartillas-sobre-diversidad-sexual-en-colegios-genera-debate-en-colombia-39931.
[75] Olga L. González, "*La otra subversión: la emergencia del 'género' en el proceso de paz en Colombia*", *Trayectorias Humanas Transcontinentales (special issues)*, No. 1 (2017): *Conflictos y procesos de paz: el caso de Colombia*, pp. 115 et seq.
[76] Colombian Commission of Jurists, *¿Cuáles son los patrones? Asesinatos de líderes sociales en el post Acuerdo.*

they begin to collaborate with the Truth Commission, the Special Unit for the Search for Disappeared Persons and the Special Jurisdiction for Peace.

### 6. Journalists, students and trade unionists

53. According to the Foundation for Freedom of the Press, attacks on press freedom have increased compared to 2017 and 2018. As at 4 October 2019, 329 violations of press freedom had been registered, 79 of them against women journalists. These include the murder of 2 media professionals, 104 threats, 43 legal actions against journalists and 21 attacks related to election campaign coverage. Journalists and media professionals working on human rights and corruption issues are at greater risk, and those working in the regions, particularly in Arauca, Cauca, Antioquia and Nariño, are more exposed. In rural areas, there have been reports of a general climate of fear that has led to self-censorship in the sector.

54. University students are key actors and promoters of social movements in Colombia. During the Special Rapporteur's visit, students demonstrated throughout the country. They reported that they receive threats for leading demonstrations, are subjected to unnecessary use of force by the Mobile Anti-Riot Squad during student protests, and their movement is stigmatized and accused of being composed of infiltrators of FARC-EP dissidents and terrorists. In October, students again took to the streets to protest the repression by the Mobile Anti-Riot Squad, the stigmatizing narrative surrounding the student movement and corruption within institutions of higher education, and to defend the model of free and universal education.

55. In the period from the signature of the Peace Agreement until 31 December 2018, the National Trade Union School registered 489 violations of life, liberty and physical integrity committed against trade unionists, of which 66 were homicides.[77]

## IV. The national mechanism for the protection of human rights defenders

56. Since its creation in 2011,[78] the National Protection Unit, a national entity with legal personality and administrative and financial autonomy attached to the Ministry of Interior, has been responsible for coordinating and implementing protection measures for, among others, human rights defenders who are at risk because of their work in defending and promoting human rights, including social leaders, trade unionists, leaders or members of ethnic groups, journalists and social communicators, victims of the armed conflict and land restitution claimants.

57. The National Protection Unit analyses requests for protection, carries out risk assessments, implements individual protection measures and coordinates the granting of collective measures based on a differentiated and gender-sensitive approach.[79] The year the Peace Agreement was signed, the number of applications for protection doubled. From 2016 to June 2019, the National Protection Unit adopted measures in respect of 2,980 registered defenders, including the provision of 4,461 communication devices, 4,678 bulletproof vests, 669 panic buttons, 4,258 bodyguards, 2,576 vehicles (armoured and conventional)[80] and since 2017 awarded collective measures in 37 cases.

58. Defenders question the effectiveness of National Protection Unit's protection measures, particularly the emphasis on their individual and material nature, the delays in risk assessment, which have resulted in lives being lost,[81] the requirement for excessive information, including membership of legally established organizations, and the lack of a

---

[77] www.ens.org.co/lee-y-aprende/lee-y-descarga-nuestras-publicaciones/nuestras-colecciones/cuaderno-de-derechos-humanos/cuaderno-de-derechos-humanos-26-la-paz-se-construye-con-garantias-para-la-libertad-sindical/.
[78] Decree No. 4065 of 2011.
[79] Decree No. 1066 of 2015 and its nine amending decrees include a collective approach.
[80] National Protection Unit, *Reingeniería del Programa General de Prevención y/o Protección de competencia de la UNP*, pp. 24–25.
[81] According to OHCHR, the National Protection Unit's delay of more than one month in granting protection measures led to the killing of two defenders in 2018, A/HRC/40/3/Add.3, para. 28.

differentiated, preventive and collective approach adapted to the traditional forms of self-government and self-protection of indigenous and Afro-Colombian defenders. The Special Rapporteur received complaints about the bodyguard protection schemes. The National Protection Unit does not recognize indigenous, Maroon and campesino guards as forms of self-protection. There have also been reports of cases in which the proposed escorts were former police or paramilitary personnel, and others in which the assigned escort was changed despite the defenders' objections.

59. The Special Rapporteur applauds the Government's decision to renew and restructure the National Protection Unit's protection programme in response to the conclusions of the Covenant for Life (the third commitment) and in line with the timely action plan and the priorities expressed by civil society in the participatory process through which it is being implemented. These efforts could fail if the National Protection Unit is not provided with the necessary budget to carry out its programme and implement the reforms. The Director of the National Protection Unit has publicly denounced the lack of budgetary resources for the programme as of June 2019.[82]

## V. The Ombudsman's Office

60. The Ombudsman's Office is the national human rights institution in Colombia. Since 1991 it has had A status in recognition of its full compliance with the principles relating to the status of national institutions for the promotion and protection of human rights (the Paris Principles).[83] Its constitutional mandate includes the promotion, protection and defence of human rights and the receipt of complaints from citizens in this area. Although its Strategic Plan 2017–2020[84] does not make specific reference to human rights defenders, the Office plays a critical role in their public recognition and protection.

61. The early warning system of the Ombudsman's Office has warned of the high risk faced by defenders through risk report 010-17 (in 277 municipalities) and early warning No. 026-18 (in 322 municipalities).[85] Between 1 March 2018 and 17 May 2019, the Ombudsman's Office recorded an increase in conduct that violated the rights of defenders (196 murders and 1,351 threats and other attacks).[86] In addition, it identified new risk factors for defenders, mainly difficulties in inter-agency coordination and the reform of protection mechanisms and risks associated with the 2018 and 2019 elections.

62. The Ombudsman's Office also issued 140 early warnings in 2018 and 39 in the first half of 2019 concerning the situation of defenders and possible and imminent attacks against them. The effectiveness of these warnings is increasingly compromised by the poor response of the authorities and institutions responsible for taking action. According to the Ombudsman's Office, forums such as the Intersectoral Commission for Rapid Response to Early Warnings do not have methods in place for responding rapidly to the risk scenarios identified in early warnings. The Ombudsman's Office also plays an important role in monitoring, documenting and reporting murders, threats and other attacks against human rights defenders, in accordance with its constitutional mandate.

## VI. Role of non-State actors

63. The Special Rapporteur has received information on the negative impact of the actions of international and national public and private companies operating in Colombia on many of the communities affected by their projects, and on the abuses faced by defenders in these contexts. Between 2015 and 2018, at least 115 incidents were registered, including acts of intimidation, stigmatization, criminalization, forced displacement and

---

[82] www.hoydiariodelmagdalena.com.co/archivos/195994.

[83] It has recently been reaccredited with A status, https://nhri.ohchr.org/EN/Documents/Status%20 Accreditation%20Chart%20(04%20March%202019.pdf.

[84] Adopted by resolution No. 194 of 2017 of the Ombudsman's Office.

[85] Early warning No. 026-2018 of the Ombudsman's Office, pp. 22–27.

[86] Ombudsman's Office, *Informe de Seguimiento a la Alerta Temprana 026-18*, August 2019, pp. 7–10.

even killings of defenders in areas with strong business activity.[87] Thirty per cent of the attacks occurred in areas with large-scale mining projects (particularly gold), while 28.5 per cent took place in areas where palm oil (in Cesar, Chocó, Meta and Nariño), banana (Caribbean zone) and sugar cane (Northern Cauca, Valle del Cauca and Vichada) agribusinesses operate. The remainder were connected to energy sector projects (oil, gas, coal, hydroelectric dams, wind and solar parks) and other infrastructure and tourism projects.[88] There are also business initiatives that are having a positive impact, such as the joint declaration of June 2018[89] and the road map for the protection of life and integrity that guides companies' actions in response to threats.

64.     In Colombia, common and organized criminal groups, including transnational groups, are materially responsible for a significant percentage of the murders of defenders and threats and other violations of their rights.[90] Some of these groups include members of former paramilitary groups, such as the United Self-Defence Forces of Colombia. Illegal armed groups, such as the People's Liberation Army (or "Pelusos"), the ELN and the dissidents or residual groups of the FARC-EP, have also attacked human rights defenders. The Special Rapporteur has received repeated allegations of inaction and even apparent collusion by corrupt State security forces with the above-mentioned illegal groups, and of their proximity, through corruption or the financing of political campaigns, to local authorities and businesses for the purchase of "security" in some contexts.

65.     In their public discourse, some representatives of the evangelical and Catholic churches reject what they consider the "imposition of gender ideology", which is simply the recognition of the human rights of lesbian, gay, bisexual, transgender and intersex persons and the sexual and reproductive rights of women. The Special Rapporteur is concerned that this is accompanied by social mobilization and an increase in discriminatory statements against the lesbian, gay, bisexual, transgender and intersex community and those who defend sexual and reproductive rights.

## VII. Community of human rights defenders

66.     Human rights defenders in Colombia have diverse profiles and work on the full range of human rights issues at the local, regional, national and international levels. There is strong coordination among human rights defenders through formal and informal networks, and they have structured their work in a participatory and coordinated manner through four major thematic platforms. Many of the leaders still do not consider themselves human rights defenders. However, in accordance with the Declaration on Human Rights Defenders, social leaders are human rights defenders when they act individually or with others to promote or protect human rights peacefully at the national or international level.

67.     Colombian civil society played a key role in incorporating a human rights and gender perspective into the Peace Agreement, and continues to do so in its implementation. Civil society advocates effective political participation to create a safe and enabling environment for the defence of human rights and to provide security for its members.

## VIII. Conclusions and recommendations

68.     **The Rapporteur's visit took place three months after the change of government that made Iván Duque President and two years after the historic signing of the Peace Agreement between the Government of Colombia and FARC-EP that ended more than five decades of conflict between the parties. The Special Rapporteur has noted the political will and important initiatives of the Colombian authorities to create a safe and supportive environment for the defence of human rights and appreciates the**

---

[87] Business and Human Rights Resource Centre.
[88] *Ibid.*
[89] www.derechoshumanos.gov.co/Prensa/2018/Paginas/Unidos-por-la-defensa-de-los-defensores-de-Derechos-Humanos.aspx.
[90] Colombian Commission of Jurists, *¿Cuáles son los patrones? Asesinatos de líderes sociales en el post Acuerdo*, pp. 30 and 31.

willingness of President Iván Duque to receive technical cooperation and a possible follow-up visit.

69. Having examined the information received from the Government, civil society and other stakeholders, the Special Rapporteur has concluded that the vast majority of human rights defenders in Colombia are unable to work in a safe and supportive environment. They lack positive social and public recognition and are undermined and criminalized because of their human rights work by State and non-State actors. They are in danger and the risks they face have increased in the three years since the signing of the Peace Agreement. At least 323 defenders have been killed since then, against a backdrop of high rates of impunity. Colombia remains the country with the highest number of murdered human rights defenders in Latin America, and threats against them have soared.

70. Leaders defending human rights and promoting peace agreements in the rural areas most affected by the conflict are the main targets of killings, attacks and other human rights violations. These violations have a gender dimension when committed against women human rights defenders. Defenders in Colombia are also at risk and suffer violations and abuses of their rights when they defend the land, environment and human rights of indigenous peoples and Afro-Colombians against State interests and non-State actors such as national and international corporations and other power groups. This is due to a combination of factors and unresolved structural problems.

71. The demobilization of FARC-EP was not accompanied by the mobilization and integrated presence of the State in the areas previously under its control; this inaction and/or absence of the State has allowed illegal armed groups and criminal groups to reorganize power around illicit economies. Defenders who oppose the control of these groups or their interests by defending human rights and pushing for the implementation of the peace agreements, and in particular the substitution of coca crops, have become the targets of attacks. Unfortunately, in this difficult context they lack effective State protection.

72. The delays, lack of political determination and failure to allocate sufficient funds for the implementation of the Peace Agreement, which prioritizes, among other things, the dismantling of these groups and the integrated presence of the State, is undoubtedly one of the key structural causes that keeps human rights defenders at risk. Moreover, it jeopardizes the prospect of a lasting peace, to the detriment of Colombian society as a whole. It also remains to be seen what impact the recent rearmament of a minority of former FARC-EP combatants will have on the implementation of the Peace Agreement and on the situation of human rights defenders.

73. The Special Rapporteur notes that two other structural factors are involved: the State's historical debt with respect to the human rights of ethnic communities and campesinos and their access to land, which has so far proved to be in the interests of national and international corporations and certain elites, and the lack of agrarian reform and land restitution. The number of conflicts related to the protection of land and environmental rights will continue to increase until the issue of a sustainable development model is addressed and a human rights-based agreement is reached with the affected communities.

74. The Special Rapporteur recommends that the Government of Colombia:

(a) Reaffirm political commitment to the Peace Agreement and prioritize its implementation, allocating the necessary resources to do so, in particular the mechanisms for the protection of human rights defenders, ensuring:

(i) The effective functioning of the National Committee for Security Guarantees and the adoption and implementation of a public and criminal policy to dismantle criminal organizations or conduct that attacks defenders

(ii) The comprehensive deployment of civilian institutions and State services (security, justice, education, health, etc.), prioritizing areas where human rights defenders are most at risk, and an approach to security matters based on human security and emphasizing training of security forces in human rights, gender issues and the Declaration on Human Rights Defenders

(iii) **Sufficient funds and personnel for the special unit of the Attorney General's Office for the investigation and prosecution of crimes against human rights defenders**

(iv) **The autonomy of the early warning system of the Ombudsman's Office and the implementation of a coordinated and effective response to risks faced by human rights defenders by the competent authorities, and the proper functioning of the Comprehensive Security and Protection Programme for Communities and Organizations in the Territories**

(v) **A national development, agrarian reform and land restitution plan with an ethnic and human rights focus and aligned with the Sustainable Development Goals.**

(b) **Adopt and implement the Comprehensive Public Policy on Respect and Guarantees for the Work of Human Rights Defenders with the participation and agreement of civil society, ensuring the necessary time for its adoption and sufficient resources for its implementation. This policy should include a territorial, gender, ethnic and age-sensitive approach and should prioritize prevention and activate gender programmes and measures, including the Comprehensive Programme of Guarantees for Women Leaders and Human Rights Defenders and its plan of action.**

(c) **Publicly recognize, on a regular basis, including through media and social campaigns, the fundamental role of human rights defenders in society and condemn violations and attempts to undermine and criminalize them, supporting the Procurator's Office and the Attorney General's Office in taking disciplinary and other measures against officials and public authorities that act against human rights defenders. Prosecutors and judges should also receive training on the Declaration on Human Rights Defenders.**

(d) **Continue to prioritize the fight against impunity for murders of human rights defenders, undertaking to make progress in the investigation of all murders, threats and other violations committed prior to the Peace Agreement, beyond the murders and cases documented by OHCHR, providing the Attorney General's Office with the necessary resources and support to do so.**

(e) **Review or prevent the adoption of legislative instruments that restrict civic space and the rights of peaceful assembly, freedom of expression and participation in public affairs, and the rights of indigenous and Afro-Colombian peoples, and in particular the right to prior and informed consultation, ensuring compliance with human rights and the jurisprudence of the Constitutional Court in this regard.**

(f) **Ratify the Optional Protocol to the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment; the Optional Protocol to the International Covenant on Economic, Social and Cultural Rights; the Optional Protocol to the Convention on the Rights of the Child on a communications procedure and the Regional Agreement on Access to Information, Public Participation and Access to Justice in Environmental Matters in Latin America and the Caribbean, recognize the communications procedure of the Optional Protocol to the Convention on the Elimination of All Forms of Discrimination against Women and sign the United Nations Declaration on the Rights of Peasants and Other Persons Working in Rural Areas.**

(g) **Provide the National Protection Unit with the necessary budget to carry out the reform process already under way, with the participation of civil society, which should prioritize the reduction of response times, the inclusion of a preventive approach, coordination with judicial investigations and the participation of human rights defenders and their families (including minors) in the design of individual and collective protection responses with an ethnic, gender and territorial focus, as demanded by civil society, and the recognition of indigenous, Maroon and campesino guards as a self-protection measure within the framework of the Unit's response.**

(h) **Ensure that all State institutions recognize social leaders who promote and protect human rights as human rights defenders and do not require them to be**

members of a legal organization and/or have a paid position in one in order to be recognized as such, in line with the Declaration on Human Rights Defenders.

75.  The Special Rapporteur recommends that the Ombudsman's Office:

(a)  Strengthen its current methodology for monitoring and documenting killings and other violations of the rights of defenders and coordination and harmonization with civil society and OHCHR in this regard, with the aim of leading and providing solid information to inform the investigations of the Attorney General's Office and policies, programmes and measures for the prevention of violations and the protection of defenders.

(b)  Strengthen early warnings on risks to human rights defenders and make them more specific in order to encourage the implementation of the response coordinated by the Intersectoral Commission for Rapid Response to Early Warnings of State institutions.

76.  The Special Rapporteur recommends that United Nations organizations and agencies and the international community publicly support and maintain a regular dialogue with the defenders' community and civil society and train their staff on the Declaration on Human Rights Defenders.

77.  The Special Rapporteur recommends that companies and other non-State actors:

(a)  Respect the human rights of defenders and refrain from violating their rights.

(b)  Comply with the Guiding Principles on Business and Human Rights. Before developing projects, companies must evaluate their impact on human rights, including the right to a healthy environment, and if they affect indigenous and/or Afro-Colombian peoples they must hold prior and effective consultations, respecting their decisions in accordance with international norms and principles and the jurisprudence of the Constitutional Court.

(c)  Companies and religious groups should refrain from stigmatizing or criminalizing rights defenders and should publicly recognize the important role they play.

78.  The Special Rapporteur recommends that civil society:

(a)  Maintain existing platforms by strengthening links and cooperation with defenders in the territories and rural areas, ensuring their contribution to an effective strategy for lobbying the government;

(b)  Address the issue of discrimination against women and lesbian, gay, bisexual, transgender and intersex defenders within the framework of broader human rights movements.